We have five cases on the calendar this morning. A patent case from the Patent Office, a trade case dumping from the Court of International Trade, a patent case from the District Court, and two government employee cases from the MSPB, which are not being argued and are submitted only on the briefs. The first case is the Patent Office case. In Re Stan Cipkowski, 2012, 1552. Mr. Shulman. Thank you, Your Honor. May it please the Court, my name is Bill Shulman. I represent the appellant Stan Cipkowski and the real party of interest, which is American Biomedical Corporation. I'd also like to request three minutes... Mr. Shulman, speak up a little bit, please, sir. Yes, sir. I'd also like to request three minutes of my time for rebuttal. Appellant submits to this Court that the Board finding of obviousness in this case is not supported by substantial evidence because the interpretation that the Board made of the central reference cited against the claims, the May reference, was not a reasonable interpretation. As the Court is aware, the claims in this case are directed to a test card, which is configured to allow testing of a drug of abuse where a liquid sample is applied to a test strip, at which point the sample is carried by capillary action to a test zone where it's determined whether a drug of abuse is present. Now, the Board's position on this case... Mr. Shulman, the prior art is pretty close, isn't it? Yes, I have to say the prior art has a number of similarities. I think the first point is the Patent's Office position appears to be that these cases are prior art and our claims are identical but for one feature. In fact, that's not exactly true. Our device is a test card. The device in May is somewhat of a hollow casing device. Our device is directed to drugs of abuse. May is primarily directed to pregnancy tests. But the most relevant difference, the one I want to focus on, is the key element of the claims, which is not found or suggested in the prior art, which is the prior art actually teaches away from this particular element. It's the element of our test card that the device is configured so that the liquid sample is directed to a sample contacting point on the front part, the exposed front surface of the test strip. When you say teaching away, Mr. Shulman, I take it what you're basically arguing, if I understand your case correctly, is that there's nothing in the prior art to suggest going in the direction you want to go. That's exactly correct. But that's not teaching away. That's simply leaving it an open question, which presumably is the question for one of skill in the art to have figured out. I understand, but the teaching away, as the case of Gurley has pointed out, does the reference point you in a divergent path from where our claims go? Our claims go specifically to a path, in fact, the capillary action path, which is along the surface of the test strip. The prior art, particularly the May reference, in 100 percent of its embodiments in its language points to a path which is through the ends of the test device, the ends of the test strip, and not at all the surface. It might point the court's attention to the appendix, page A109. The May starts out in terms of how it's directing its liquid sample. This is lines three to five. It says, the liquid sample is allowed to permeate through the sheet or strip from one side or end to another. In other words, at no point does it direct the initial sample contacting to be the front of the test strip. This language is followed up at page A117, lines 26 to 30, where the language is so that the liquid sample can be absorbed by the bottom end, 11, of the test strip, 20, and rise by capillary action to the top 17 of the test strip. Now May goes on to have a series of five different embodiments that are all 100 percent consistent with these teachings. Only teaches directing the sample at the ends to go through the test strip all the way to the top. This does not disclose or suggest the direction of the sample to be at the front surface, as in our case, which the difference does give us some more efficiency in terms of the capillary action. Indeed, the point of the board, as I understand it, is there is a lot of language in the May reference with regard to the term directly. We don't disagree that there's language to the term directly. However, in each and every case where that language is used is referring to an embodiment such as figures three to five, or 13 and 14, where the device is configured so that the ends are now exposed to the test sample so that, once again, the application of the test sample is to the end of the test strip, completely different than our claim device where the application is on the front surface. The board has also pointed to figures 11 and 12 of May as showing an opening on the front surface of the May device. Indeed, that once again makes the point because in May, where they have the opening on the front surface, the opening goes below the test strip. Once again, the sample is directed below the test strip, that the only way the fluid can approach the test strip is from the bottom. Well, they both work, don't they? What's the practical difference? Ours is a more efficient way of testing. As I said, our device is a device for drug testing, which is often, sometimes it's used in a way called a point of arrest where you might need a very quick test in a very short amount of time. The other test is, as I said, is primarily directed to something like a pregnancy test where it's not, the amount of time you would need is not a crucial factor in determining the health of the test. Can you though, can't it? Well... That's all. Just an aside. You may have read a bit about my history, but no. To be honest, it's a completely different type of test for a completely different type of purpose. Again, if somebody is reading the May reference, they would not at any point be taught or suggested to use the front surface to drop the sample on the front surface. Is there evidence in the record by way of a declaration or affidavit attesting to the fact that the Pryor device would not be usable in the manner that your claim device is? Well, I'm not aware of any... Attorney argument. I'm not aware of anything specific. What we've referred to is the disclosure in May, which is very consistent in our case, which is also very consistent in our case. What you see is one operates in a completely different principle than the other. One operates in the sense of having the fluid of the capillary action flow along the surface. The other one operates where it's strictly at the end. It does not teach or suggest our claim invention, that claim element where the sample is applied to the front surface. So with that in mind, again, we don't see any reasonable interpretation which teaches or suggests arranging a device where the sample is applied to the front surface. The only other position, as we understand it from the board, was citing the Boger reference, which is admittedly a reference that does not involve capillary action at all because it doesn't involve capillary action. There's no concern at all with the transmission of whatever is applied to the device in Boger to move at all by capillary action we submit. Therefore, it cannot be added to make to disclose or teach the present invention. As I mentioned earlier, I think this is a direct case of teaching away. As I mentioned, the case of Ingrid Gurley very specifically says would somebody reading the reference would be led in a direction divergent from the path taken by the applicant. I think this is a case where the path that is taken, the mode of operation for the primary device is different. It's completely different than the mode of operation for our device and thus we submit that there is a teaching away based on the case of Gurley and that that also confirms that the position of the board was not reasonable. Unless there are any further questions, I will reserve the rest of my time. We will save it for you Mr. Shulman. Thank you very much. Good morning Mr. Shulman. Good morning. Good morning and may it please the court. This case presents a very limited issue. Appellant does not dispute that the prior art teaches and supplies motivation to combine all of the limitations of the claimed device but one and that is the precise location of the opening of the sample receiving portion exposing the front surface of the test strip. Substantial evidence supports the board's findings that a person of ordinary skill in the art would have been motivated to place the opening directly over the front surface of the test strip. As the board found, May teaches, May has a very broad reference that teaches many of the limitations of the claimed device. There are two additional references, Sun and Boger, which supplement some of the few things that are not directly found in May. But May itself for this issue that's before the court where the location of the hole should be, May itself on its own first of all suggests and teaches placing an opening over the front surface of the test strip. First, May has a very broad general disclosure and it teaches that in a typical embodiment of convention, a test strip is in a hollow casing and the casing is constructed such that the test strip can communicate directly or indirectly with the exterior of the casing. Mr. Shulman argues that May teaches a way. Your Honor, the standard for teaching a way is does the reference criticize or suggest that the way of doing it would not work here and there's nothing in May that does that. In fact, May, because it suggests direct contact and provides a series of preferred embodiments where the opening to receive the sample is either in direct contact on the lower portion of the device or even indirectly on the front surface of the device suggests the... Do you understand indirectly means in that context? Yes, Your Honor. The indirect example is in figures 11 and 12 of the May reference where... which look a great deal like the claim device and in that in figures 11 and 12 there is a sample receiving opening that is on the front surface of the test device. The test strip isn't directly underneath it. Underneath the opening is a porous receiving member which is sort of like a sponge or a reservoir that allows the sample to then go through that sponge and then contact the test strip. But that's an optional that's an optional embodiment the porous receiving member. The many other embodiments that are described in May most of them don't have that porous receiving member. And as the Board found expressly in its own opinion looking at this figure 11 which looks very much like appellant's claim device one of ordinary scale based on the general disclosure of May that the sample may directly contact the test strip would be motivated to alter this device to either have the casing be a little shorter or the test strip be a little longer and remove the porous receiving sample porous receiving member excuse me. To the extent that that May might be insufficient on its own which we contend it is not that the entire device is suggested that the entire issue is resolved by May one also could look to Boger which does have an opening directly over the front surface of the test strip. Talent suggests that Boger is not applicable because it does not operate by capillary action but what Boger has relied on is simply its teaching of an opening over the front surface of the test strip to place a sample. It doesn't really matter for that purpose what happens to the liquid after it goes onto the test strip. May does operate by capillary action and May is the primary reference here. So I believe that argument is not persuasive. There is nothing in the record Your Honor that we have seen that indicates that it matters whatsoever to the efficiency of the test strip whether the sample is placed on the very bottom end or just slightly above the bottom end on the front surface of the test strip. In fact, as long as the sample is placed below the first line on the test strip where the antibody labeled antibody is dried, there is nothing that suggests that the test strip would operate any differently at all. One small point, May does actually  tests for drugs. It is used for pregnancy tests and ovulation tests and other tests but at appendix A14 lines 6 through 10 it is referred to as a drug test and May does refer to drugs as one of the  that it is able to test for. There is an additional reference, Sun, which makes very clear that a competition based assay as opposed to a sandwich based assay is well known to test for drugs of abuse. The examiner relied on that reference because the claimant issue has a means post function limitation and it may be less clear in May that a competition based assay may be used to test for drugs for abuse. But May does disclose testing for drugs. And I believe, Your Honor, unless you have any additional questions. I have a procedural issue if you're through with the merits on it. Maybe you can help me with it. This is a 103 obviousness case decided presumably using the four Graham factors, one of which is the hypothetical person of ordinary skill in the art. The board expressly adopted the examiner's findings on that issue. But I don't see that the examiner made any findings on that issue. What is your view of who the hypothetical person ordinary skill in the art is and under KSR shouldn't there be something in the record about that? Your Honor, the case the appellant relies on, and I'll mingle the name, but it's Enrique Vidiathan discusses that issue directly. And while the board's opinion was a little bit short, the issue that it had to deal with is a fairly narrow issue. And it expressly adopted the findings and conclusions of the examiner who did make lengthy findings and had a lengthy analysis of the content and the scope of the prior art. I don't believe that the examiner did make express findings on who one of ordinary skill in the art would be here. But as Enrique Vidiathan explains, those findings are not required expressly. As long as the board provides enough detail in its opinion to allow for appellate review and explain why one of ordinary skill in the art would combine the relevant references, that amount of detail is sufficient. We clearly have precedent that suggests that. The Supreme Court and KSR seem to say those things should be made explicit. Are you suggesting we could under rule the Supreme Court on this issue? Certainly not, Your Honor. Certainly not. And I believe in KSR that the Supreme Court did require a full analysis of whether or not what the motivation would be. Is this simply a combination of predictable elements that operate according to known principles where the combination yields expected results? I think that's really the core of the KSR analysis and that analysis was provided here by the examiner. The examiner went through a detailed explanation of why for multiple reasons each of the claim device are present in the prior art, why they operate according to predictable fashion and why there's no expectation that they would yield anything other than predictable results. I suppose you could also argue that this technology is sufficiently simple that one of common sense could understand it. That's also a Supreme Court decision. The examiner and the board did give detailed findings and detailed references to specific prior art references that this particular issue is simple enough that the board could perhaps have just relied on common sense. This is much like the break assembly I believe it was in KSR where it's a very simple change that many of us would think we could make on our own. Thank you  Thank you Ms. Hunn. Mr. Shulman  minutes or so for rebuttal. Thank you Your Honor. I may not take all of that. Just a few points in rebuttal. First point being again when the specific language supported the suggestion in May for our particular form of claims they related to the language of the sample being directly and indirectly applied to the test strip. Again, Your Honor asked the counsel about that. In this case both directly and indirectly have nothing to do with  standard that the board was relying on. Indeed, was not something that suggested going to the front surface. The second point I wanted to make is that as was brief there was no standard provided excuse me there was no finding by the examiner of the ordinary skill in the art which is something we did point out in our brief and as a result again there is a lack of foundation going from the May which we have shown is different and submitted a teaching way of our claims to get them that point to make any change because the requisite standard of the ordinary skill in the art was not provided. I submit to you when you read the May reference starting at appendix page A109 it says exactly how the liquid sample is allowed to permeate through the strip from one side or end you go through the entire reference and I would state that it's a challenge to find anything that teaches either directly or suggests going to the embodiment of applicant claims where the sample is applied directly to a sample contacting portion on the front surface of the test strip. Thank you. Mr. Coleman we'll take the case under advisement.